**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| TAMMY L. BRANNON, | ) | CASE NO. 1:15-CV-00904 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | VECCHIARELLI |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security, | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| Defendant. | ) | **ORDER** |

Plaintiff, Tammy L. Brannon ("Plaintiff"), challenges the final decision of

Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security

("Commissioner"), denying her applications for Period of Disability ("POD"), Disability

Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II

and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This

case is before the undersigned United States Magistrate Judge pursuant to the consent

of the parties entered under the authority of 28 U.S.C. § 636(c)(2).  (Doc. No. 14.)  For

the reasons set forth below, the Commissioner's final decision is REVERSED and

REMANDED for proceedings consistent with this Memorandum Opinion and Order.

## I.   PROCEDURAL HISTORY

On August 29, 2011, Plaintiff filed his applications for POD, DIB, and SSI,

alleging a disability onset date of April 1, 2009.  (Transcript ("Tr.") 15.)  The claims were

denied initially and upon reconsideration, and Plaintiff requested a hearing before an

administrative law judge ("ALJ").  (*Id.*)  On July 10, 2013, an ALJ held Plaintiff's hearing.

(*Id.*)  Plaintiff participated in the hearing, was represented by counsel, and testified.  (*Id.*)

A vocational expert ("VE") also participated and testified.  (*Id.*)  On October 1, 2013, the ALJ found Plaintiff not disabled.  (Tr. 32.)  On March 9, 2015, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision.  (Tr. 1.)

On May 7, 2015, Plaintiff filed his complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 18, 19, 21.)

Plaintiff asserts the following assignments of error: (1)(A) the ALJ failed to give good reasons for discounting the opinion of one of her treating physicians; (1)(B) the ALJ failed to consider Plaintiff's non-exertional limitations; and (2) the ALJ's credibility determination was not supported by substantial evidence and was the product of legal error.  (Doc. No. 18.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Plaintiff was born in April 1969 and was nearly 39-years-old on her alleged disability onset date.  (Tr. 30.)  She had at least a high school education and was able to communicate in English.  (*Id.*)  She had past relevant work as a dietary cook, home health aide, food deliverer, cleaner, sales clerk, machine operator, and inspector/quality control.  (Tr. 28-29.)

### B.    Relevant Medical Evidence[1]

Since her April 1, 2009 alleged onset date, Plaintiff has received treatment for

---

[1]  The following recitation of the medical evidence of record is not intended to be exhaustive.

2

numerous conditions, including the following: morbid obesity (Tr. 531,554); bilateral

knee pain (Tr. 456, 462, 475-76, 481-482, 556); post-arthroscopic surgery to repair a

medial meniscus tear in the left knee (Tr. 479); arthritis of the right shoulder

post-arthroscopic rotator cuff surgery (Tr. 392-93, 399-404); post-surgical intervention

on her left thumb for trigger thumb (T 384-85); lower back pain (Tr. 406-407);

non-malignant ovarian cysts and uterine fibroids (Tr. 649-50); myalgia and myositis

(555-56, 687, 691); depression with anxiety (Tr. 554-56); and restless leg syndrome.

(Tr.  549.)

On April 6, 2010, Plaintiff began treatment with her primary care physician,

Sandeep Patel, M.D.  (Tr. 554-57.)  At this initial visit, Dr. Patel noted that multiple tests

will be performed to rule out secondary reasons for Plaintiff's chronic pain and that his

diagnosis of fibromyalgia was based on multiple trigger points.  (Tr. 555-56.)  One

month later, on May 6, 2010, Dr. Patel continued to diagnose fibromyalgia but did not

note the results of the above testing or discuss the number or location of positive trigger

points.  (Tr. 551-52.)  In July and August of 2010, Dr. Patel mentioned "diffuse trigger

points suggestive of fibromyalgia" and continued to include it among his diagnoses.  (Tr.

538, 541.)   Dr. Patel continued to diagnose fibromyalgia in December of 2010 and June

of 2011.  (Tr. 523, 533.)

On February 22, 2011, Robert Zanotti, M.D., performed arthroscopic surgery of

Plaintiff's right shoulder to repair her rotator cuff.  (Tr. 399-400.)  At her first post-

operative follow-up two days later, Dr. Zanotti noted "[m]otion was within normal limits

for first post op visit."  (Tr. 390.)  On March 17, 2011, Dr. Zanotti noted that Plaintiff

could move her shoulder in a normal fashion without significant change.  (Tr. 388.)

3

On May 3, 2011, Dr. Zanotti performed trigger thumb release surgery, and Plaintiff had her first follow-up on May 11, 2011 where it was noted that the thumb was stable and there was no sign of triggering.  (Tr. 384-85.)  Plaintiff denied the need for work restrictions and was given Vicodin for pain.  (Tr. 384.)

On December 23, 2011, Benjamin Abraham, M.D., noted a primary encounter diagnosis of myalgia and myositis.  (Tr. 432-35.)

On January 18, 2012, Plaintiff was seen by Ronald G. Smith, Ph. D., for a consultative examination.  (Tr. 412-19.)  Plaintiff was unkempt in appearance and tearful throughout the interview; her responses tended to be "somewhat rambling and tangential." (Tr. 415.)  Dr. Smith observed that Plaintiff had considerable difficulty differentiating between depression, anger, and anxiety.  (Tr. 416.)   She was oriented to time and place.   (Tr. 417.)  Dr. Smith diagnosed dysthymic disorder and personality disorder, not otherwise specified, with borderline features.  (Tr. 418.)  He assessed a Global Assessment of Functioning ("GAF") score of 50.[2]  Dr. Smith concluded that Plaintiff "should be able to understand and remember job instructions on a mental basis," although "[h]er ability to carry them out in a consistent manner may be questionable due to her emotional instability."  (Tr. 419.)  He further concluded that she would have trouble maintaining attention and concentration, and would likely have

---

[2]  The GAF scale reports a clinician's assessment of an individual's overall level of functioning.  *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (American Psychiatric Ass'n, 4th ed. revised, 2000) ("DSM-IV").  An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments.  A GAF score between 41-50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. DSM-IV at 34.  A recent update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice."  *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

4

problems maintaining persistence in the performance of even simple tasks.  (*Id.*)  He believed she may have problems dealing with others in a job situation due to emotionality and would likely break down and cry in response to criticism or correction.  (*Id.*)  Finally, Plaintiff's ability to respond appropriately to work pressures would be "limited by her easily resorting to tearfulness in response to relatively mild stress."  (Tr. 419.)

On July 30, 2012, State Agency psychologist Bruce Goldsmith, Ph. D., found that Plaintiff had no restrictions in activities of daily living; no episodes of decompensation of an extended duration; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace.  (Tr. 120.)

On August 13, 2012, Plaintiff underwent left knee arthroscopic surgery to repair a medial meniscal tear.  (Tr. 479.)  On August 15, 2012, in a follow-up Plaintiff stated that she was still having some pain and was using a walker for ambulation.  (Tr. 473.)  She was prescribed Oxycodone-Acetaminophen every 4-6 hours.  (*Id.*)  On August 29, 2012, Plaintiff was still using one crutch for ambulation and continued to complain of localized pain in the left knee.   (Tr. 471.)  It was noted that she had good range of motion and minimal swelling.  (*Id.*)  She was advised to "[c]ontinue to weight bear as tolerated ....  Discontinue the use of the crutch and followup" in a few weeks.  (Tr. 472.)

On November 8, 2012, non-examining State Agency physician Anne Prosperi, D.O., completed a physical RFC assessment finding that Plaintiff could lift 10 pounds frequently and 20 pounds occasionally, stand/walk for 2 hours and sit for 6 hours in an 8-hour workday.  (Tr. 121-124.)  Furthermore, Plaintiff could occasionally climb ramps/stairs, stoop, kneel, and crouch; frequently balance; and never climb ladders

5

ropes, or scaffolds.  (Tr. 122.)  As for manipulative restrictions, Plaintiff had no

limitations except for limited reaching overhead with the right arm.  (Tr. 123.)   Plaintiff

also had no environmental restrictions aside from the need to avoid all exposure to

hazards.  (*Id.*)

On February 8, 2013, Dr. Abraham again made a primary encounter diagnosis of

myalgia and myositis.  (Tr. 691.)

On May 3, 2013, certified nurse practitioner Katherine Ledyard made a primary

encounter diagnosis of myalgia and myositis, unspecified.  (Tr. 687.)

On May 16, 2013, Dr. Patel completed an RFC Questionnaire form, provided by

Plaintiff's counsel, wherein he indicated that he had treated Plaintiff for more than three

years and diagnosed her with "polyarticular joint pain, rotator cuff tear, gait ataxia ...."[3]

(Tr. 587-588.)  Plaintiff's prognosis was "good" and he identified Plaintiff's symptoms as

"mostly pain in various joints."  (Tr. 587.)  Dr. Patel checked a box indicating that

Plaintiff's symptoms would constantly interfere with the attention and concentration

required to perform simple work-related tasks.  *(Id.*)  Dr. Patel did not identify any side

effects from medications that could impact Plaintiff's capacity to work.  *(Id.*)  He also

checked a box indicating that Plaintiff would need to recline or lie down in excess of

regularly allowed breaks and would also need to take three to four unscheduled breaks

daily lasting at least 20 to 30 minutes.  *(Id.*)  Dr. Patel opined that Plaintiff could walk

less than one city block without pain rest or significant pain, could sit for 60 minutes at

one time for three hours total in an 8-hour workday, could stand/walk for 20 minutes at

---

[3]  The remaining diagnoses are illegible.

one time for 1 or 2 hours total in an 8-hour workday, and would require a job that
allowed shifting positions at will from sitting, standing or walking.  *(Id.)*  Dr. Patel further
indicated that Plaintiff could lift less than 10 pounds frequently, 10 pounds occasionally,
but could never lift 20 or more pounds.  (Tr. 588.)  He also believed Plaintiff could
handle 20 percent of an 8-hour workday with the right hand and 70-80 percent with the
left; finger 20-40 percent of a workday with the right hand and 70-80 percent with the
left; and reach 10 percent of the workday with the right arm and 50-60 percent with the
left.  *(Id.)*  Finally, Dr. Patel opined that Plaintiff would be absent from work more than
four times per month, was not a malingerer, and was incapable of working 8 hours a
day for five days a week on a sustained basis.  *(Id.)*  The questionnaire did not contain
any explanation for the limitations assessed.

**C.**    **Hearing Testimony**

    **1.**    **Plaintiff's Hearing Testimony**

At the July 10, 2013 hearing, Plaintiff testified as follows:

- She left high school after the eleventh grade, but obtained a GED when she was 23 years old.  (Tr. 49.)

- She last worked in 2009 as a dietary cook.  Her mother was the manager and Plaintiff's employment was terminated shortly after her mother was let go.  She had no conflicts with her co-workers. (Tr. 51-52.)   She had physical difficulties performing that job, noting trouble going up and down stairs.  (Tr. 53.)

- She attempted to find other work after she was terminated but received no interviews.  (Tr. 53.)

- She worked as a sales clerk between 2004 and 2006.  She left that position to take care of her father.  At times, she would miss work due to physical issues or breakdowns.  (Tr. 53-54.)

- She worked as a machine operator, but that job ended within a year after

7

the plant shut down.  (Tr. 54.)

- She also worked as a pizza delivery driver, a home health aide, and a cleaner.  (Tr. 55-56.)

- She believed the most serious problems preventing her from working was her "breathing problem" [asthma], fibromyalgia, and her knees and arms. (Tr. 57.)

- She was diagnosed with fibromyalgia a few years earlier and was prescribed Cymbalta, Lyrica, and a muscle relaxer.  (Tr. 58.)

- She could walk for 10 minutes before needing to sit and rest.  She could stand in one place for 10 to 15 minutes.  She also has problems sitting. (Tr. 58.)

- She has fibroids and cysts causing her abdominal pain for which she is "supposed to have surgery."  (Tr. 59.)

- She tries to cook and clean but takes breaks, and needs to sit or lie down. (Tr. 60.)

- Since her knee surgery, she received shots in her knee once a week for three straight weeks.  The shots help for a "couple of months or so," but she continued to wear a knee brace as it sometimes "goes out" on her. (Tr. 60-61.)

- Her fibromyalgia causes her constant soreness.  Her medications take the edge off, but the aches do not go away.  (Tr. 61-62.)

- On some days, she experiences swelling in her legs.  (Tr. 62.)

- With respect to her hips, there have not been any problems detected aside from the fibroids and cysts.  (Tr. 62.)

- She is right-handed and experiences pain when using it to peel or cut something.  She thinks she can lift no more than 5 or 10 pounds with her right arm.  (Tr. 63.)

- Prior to her trigger thumb surgery, her finger would bend and cause intense pain.  After surgery, she continued to experience "a lot of problems," but did not know whether those were attributable to the trigger finger, her nerves, or her arms falling asleep.  (Tr. 63-64.)

**2.    Vocational Expert's Hearing Testimony**

The VE testified that Plaintiff's past jobs would be classified as follows: *dietary aide*, which is unskilled and requires medium exertion though Plaintiff performed it at the light level, Dictionary of Occupational Titles ("DOT") 319.677-014; *home health aide*, semi-skilled and medium, DOT 354.377-014; *delivery person*, unskilled and medium, DOT 299.477-010; *cleaner*, unskilled and medium, DOT 919.687-014; *sales clerk*, semi-skilled and light, DOT 211.462-014; *machine operator*, semi-skilled and medium, DOT 619.685-062; and *quality control*, semi-skilled and light, DOT 609.684-010.  (Tr. 65-66.)

The ALJ posed the following hypothetical to the VE:

> I would like you to assume a hypothetical individual of [Plaintiff's] age and education with those past jobs as you described.  I would like you to further assume, and this is a long list.  The individual can lift or carry 20 pounds occasionally, and 10 pounds frequently.  Can stand or walk two hours out of eight.  Can sit for six hours out of eight.  Can occasionally climb ramps or stairs.  Can never climb ladders, ropes or scaffolds.  Can frequently balance.  Can occasionally stoop, kneel or crouch.  Can never crawl.  Can frequently reach over head with the right upper extremity.  And must avoid all exposures to hazards.  And they can occasionally understand, remember and carry out detailed or complex instructions. They cannot work at a production pace but can perform goal orientated [sic] work.  Interactions with supervisors, co-workers and the public is limited to speaking and signaling.  They require a relatively static work setting but can tolerate a few changes.

(Tr. 67-68.)

The VE testified that such an individual could not perform any of Plaintiff's past relevant work.  (Tr. 68.)  However, the VE identified the following jobs as examples that an individual with the aforementioned limitations could perform: *gate guard*, semi-skilled and light, DOT 372.667-030 with 2,796 positions in Ohio and 95,573 nationally; *cashier*, semi-skilled and light, DOT 211.462-010 with 10,091 positions in Ohio and 259,201

nationally;[4] *electrical accessories assembler*, unskilled and light, DOT 729.687-010 with 2,507 positions in Ohio and 42,093 nationally; and *inspector hand packager*, unskilled and light, DOT 559.687-074 with 3,010 positions in Ohio and 48,681 nationally.  (Tr. 68-69.)  The VE indicated that his testimony was consistent with the DOT.  (Tr. 69.)  In response to the ALJ's inquiry whether all of these jobs could be performed by someone who could stand/walk for only two hours in an 8-hour workday, the VE testified in the affirmative.  (*Id.*)

The ALJ posed a second hypothetical to the VE asking him to assume all the aforementioned limitations from the first hypothetical, but to also include the following additional limitations:

> The person can stand or walk 15 minutes at a time, and one hour out of eight in a day.  The person can sit for 30 minutes at a time, and six hours out of eight in a day.  They will be absent one to two times per month, and I took that from [Exhibit] 22F.

(Tr. 69-70.)

The VE testified that such an individual could not perform any of the previously identified jobs and also would be unable to engage in any competitive employment.  (Tr. 70.)  The VE explained that two unscheduled absences per month were outside the amount that would be tolerated by employers.  (*Id.*)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when he

---

[4]  Because all cashier jobs do not give the opportunity sit as often as the hypothetical demands, the VE indicated that he had adjusted the job numbers to reflect this fact.  (Tr. 68.)

establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981). A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan,* 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(C) *and* 416.920(C). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot,* 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d). Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§

11

404.1520(g), 404.1560(C), and 416.920(g).

## IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

2.   The claimant has not engaged in substantial gainful activity since April 1, 2009, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.   The claimant has the following severe impairments: effects from degenerative changes to C5-C6 and C6-C7 region of the cervical spine, degenerative changes to the L5-Sl region of the lumbar spine, residual effects from status-post arthroscopy of the right shoulder, degenerative joint disease of the knees bilaterally with status-post arthroscopy, degenerative changes to the hip, ongoing symptoms of left trigger finger with status-post trigger release, obesity, and psychological effects from dysthymic disorder and personality disorder (not otherwise specified) with borderline features (20 CFR 404.1520(C) and 416.920(C).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1(20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual exertional capacity to lift and carry up to ten pounds frequently and twenty pounds occasionally, to stand and walk for two hours total in an eight hour work day, and to sit for six hours total in an eight hour work day, with normal breaks.  This is consistent with a range of work that falls between the sedentary and light exertional level with the following nonexertional limitations (*see generally* 20 CFR 404.1567 and 416.967; Soc. Sec. Rul. 83-12).  She can occasionally climb ramps or stairs.  She can frequently reach overhead with the right upper extremity. She must avoid all exposures to hazards. She can occasionally understand, remember, and carryout detailed or complex instructions.  She cannot work at a production pace but can perform goal-oriented work.  The claimant's ability to interact with supervisors, coworkers, and the public is limited to speaking

and signaling. She requires a relatively static work setting but can tolerate a few changes.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on April 7, 1969 and was 39 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work expe1ience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from April 1, 2009, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 17-31.)

## V.    LAW & ANALYSIS

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence,

13

regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court

does not review the evidence *de novo*, make credibility determinations, or weigh the

evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir.

1989).

The Commissioner's conclusions must be affirmed absent a determination that

the ALJ failed to apply the correct legal standards or made findings of fact unsupported

by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281

(6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a

preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by

substantial evidence will not be overturned even though substantial evidence supports

the opposite conclusion.  *Ealy*, 594 F.3d at 512.

## B.    Plaintiff's Assignments of Error

### 1.  Treating Physician

Plaintiff argues that the ALJ violated the treating physician rule with respect to Dr.

Patel, her primary care physician.  (Doc. No. 18 at 21-28.)  Though Plaintiff does not

specify which opinion of Dr. Patel the ALJ improperly rejected, the Court presumes

Plaintiff refers to the opinions expressed by Dr. Patel in functional limitations set forth in

the RFC Questionnaire he completed on May 16, 2013.  (Tr. 587-588.)

"An ALJ must give the opinion of a treating source controlling weight if he finds

the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic

techniques' and 'not inconsistent with the other substantial evidence in the case

14

record.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotes omitted).  If an ALJ decides to give a treating source's opinion less than controlling weight, she must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *See Wilson*, 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL 374188, at *5 (S.S.A.)).  This "clear elaboration requirement" is "imposed explicitly by the regulations," *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), and its purpose is to "let claimants understand the disposition of their cases" and to allow for "meaningful review" of the ALJ's decision, *Wilson,* 378 F.3d at 544 (internal quotation marks omitted).  Where an ALJ fails to explain her reasons for assigning a treating physician's opinion less than controlling weight, the error is not harmless and the appropriate remedy is remand.  *Id*.

The Commissioner, on the other hand, contends that the ALJ properly gave less weight to Dr. Patel's opinion, particularly noting the lack of evidentiary support for Dr. Patel's opinion.  (Doc. No. 20 at 9-12.)  The decision contains the following discussion of Dr. Patel's opinion:

> The undersigned has reviewed treating source statements from the claimant's primary care physician Dr. Patel and her gynecologist Dr. Sharif[5] but gives them less weight because there are inherent inconsistencies in their opinion that reflect a lack of knowledge of the

---

[5]  According to Plaintiff, there is no "Dr. Sharif" in the record and believes this must be a typographical error instead referring to her gynecologist Ramiz Masri, M.D.  (Doc. No. 21 at 4, n. 1.)  The Court agrees with Plaintiff's contention that the ALJ surely intended to refer to Dr. Masri, as he is identified earlier in the decision as Plaintiff's treating gynecologist.  (Tr. 18.)  Moreover, Exhibit 22 (Tr. 713-15), which the ALJ indicates is the source of "Dr. Sharif's" opinion actually contains Dr. Masri's RFC assessment.

15

medical-vocational guidelines found in the rules and regulations of Social
Security disability law.

* * *

On May 16, 2013, the claimant's treating physician (board-certified in
internal medicine) Sandeep B. Patel, M.D., prepared a residual functional
capacity assessment for the claimant (Exh. 15F).  In this assessment, Dr.
Patel opined that the claimant had polyarticular joint pain from a rotator
cuff tear that caused her gait ataxia but her prognosis with ongoing
treatment was "good" (Exh. 15F, p. 2).  The undersigned gives less weight
to his opinion because he opined that the claimant's pain symptoms would
require special accommodations during the workday, which are
inconsistent with the claimant's post-operative normal physical examination
results and her ameliorative response to longitudinal post-operative
conservative treatment modalities with some chiropractic manipulation
(Exh. 15F, p. 2; *but see generally* Exhs. 3F; 9F; 20F; see also Exhs.
4F; 13F; see also Soc. Sec. Rul. 96-2p; 96-7p; 06-3p).  Similarly, he does
not provide sufficient evidentiary support for the claimant's exertional and
nonexertional limitations.

(Tr. 26-27.)

     As stated above, Plaintiff does not specifically identify which of Dr. Patel's

limitations the ALJ improperly rejected.  The ALJ's finding that Plaintiff could stand/walk

for 2 hours in an 8-hour workday is consistent with Dr. Patel's opinion.  Nevertheless,

the ALJ apparently did reject Dr. Patel's opinion that Plaintiff could sit for only 3 hours,

Dr. Patel's lifting restrictions, and the bulk of the manipulative restrictions.[6]  (Tr. 23, 587-

88.)  The ALJ also did not find credible the need for additional breaks or Dr. Patel's

predicted absenteeism, as those limitations were not incorporated into the RFC.  (Tr.

23.)

     Plaintiff argues that Dr. Patel's alleged lack of knowledge of the

---

[6]  The only limitation in the RFC concerning Plaintiff's upper extremities is a
limitation to only frequent reaching overhead with the right upper extremity.  (Tr. 23.)

16

medical-vocational guidelines was an insufficient reason for rejecting the functional

limitations he assessed.  (Doc. No. 18 at 23-24.)  Standing alone, this Court agrees that

a treating physician's lack of familiarity with social security regulations is an insufficient

basis for rejecting an opinion.  If such a statement were enough, it could be universally

be invoked to discredit a treating source's opinion.  Furthermore, this is not a case

where a treating source simply opines that a patient is unemployable or disabled.

Rather, Dr. Patel's opinion contains specific functional limitations.

Plaintiff avers that the ALJ gave less weight to Dr. Patel's opinion because of its

inconsistencies when compared to the opinion of Plaintiff's gynecologist, Dr. Masri.

(Doc. No. 18 at 22.)  Plaintiff's reply brief reiterates this line of argument, asserting that

"the ALJ's decision does not find Dr. Patel's opinion 'internally inconsistent' and instead

finds 'inherent inconsistencies' between the opinions of treating sources, Dr. Patel and

Dr. Masri."  (Doc. No. 21 at 3-4.)  The Court does not agree with Plaintiff's dubious

interpretation of the decision.  The ALJ plainly found that both physicians' opinions were

entitled to less weight as they were *both* inherently inconsistent – *not* because the two

opinions were inconsistent with one another.  Thus, the Commissioner's assertion – that

the ALJ rejected Dr. Patel's opinion based partially on internal inconsistencies – is

correct.  However, while the ALJ clearly believed such inherent inconsistencies existed,

the decision does not actually identify those inconsistencies.

The ALJ also pointed out that post-operative treatment notes yielded normal

physical examination results and that Plaintiff had a positive response to chiropractic

treatment.  (Tr. 27, *citing* Exhs. 3F, 4F, 9F, 13F & 20F.)  Again, the ALJ makes no

meaningful effort to explain how the cited portions of the record undermine Dr. Patel's

opinion. There is case law supporting the general proposition that an ALJ's broad statement rejecting a treating physician's opinion without giving specific reasons for rejecting it requires remand. *See Wilson*, 378 F.3d at 545 (finding that the ALJ's "summary dismissal" of the opinion of the claimant's treating physician failed to satisfy the "good reasons" requirement); *Friend v. Comm'r of Soc. Sec.*, 375 Fed. App'x 543, 552 (6th Cir. 2010) ("Put simply, it is not enough to dismiss the treating physician's opinion as incompatible with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick.") By simply pointing to the medical records that ostensibly support rejection of Dr. Patel's opinion without offering a corresponding explanation or analysis, the ALJ essentially invites a reviewing court to perform its own *de novo* review of the record and to flesh out its own rationale as to why Dr. Patel's opinion should be rejected.[7] Further, this is not a case in which the ALJ's discussion of other medical evidence and opinions in the record provides a clear basis for rejecting the treating physician's opinion. *See, e.g., Nelson v. Comm'r of Soc. Sec.*, 195 Fed. App'x 462, 470-71 (6th Cir. 2006) (finding that the ALJ's discussion of other medical evidence and opinions made it clear that the opinions of the claimant's treating physicians were inconsistent with the record evidence as a whole and, thus, "implicitly provided" sufficient reasons for rejecting their opinions). While the ALJ's discussion of other evidence is significant, it does not lend any insight as to why Dr. Patel's opinion

---

[7] The medical records identified reveal that, even after surgery, Plaintiff's pain was severe enough to require knee injections. (Tr. 454-460, 676-684, Exhs. 9F & 20F).

18

was undeserving of significant weight.

Finally, the ALJ found that Dr. Patel's May 2013 opinion did not provide sufficient evidentiary support for the exertional and non-exertional limitations assessed.  (Tr. 27.) "Supportability" is one of the factors specifically set forth in the regulation.  20 C.F.R. § 404.1527(c)(3).  The regulation states that "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.  The better an explanation a source provides for an opinion, the more weight we will give that opinion." (*Id.*)  It is true that Dr. Patel's May 2013 opinion does not delve into any great detail as what signs or findings support the severe limitations assessed.  It simply sets forth Plaintiff's diagnoses and indicates her symptoms cause "pain in various joints."  (Tr. 587-88.)  In her reply brief, Plaintiff asserts that requiring an explanation "elevates form over substance" because the "copious treatment records" obviate the need for an explanation.  (Doc. No. 21 at 2-3.)  The Court does not agree that the supportability factor is inapplicable because a treating source's treatment notes have been made part of the record.  Nevertheless, the ALJ's mere statement that an opinion lacks evidentiary support, without some attempt at explanation, is insufficient.

Accordingly, the ALJ has not provided a satisfactory explanation for rejecting the opinion of Dr. Patel, thereby frustrating the dual purposes of the "good reasons" requirement: It neither sufficiently describes to Plaintiff the basis for the ALJ's conclusions concerning his treating doctor, nor provides this Court with adequate material to conduct a meaningful review.  Upon remand, the ALJ should offer an explanation as to the weight ascribed to Dr. Patel's opinions, including his diagnosis of

19

fibromyalgia (see below), that comports with social security regulations.[8]

### 2. Fibromyalgia and Non-Exertional Impairments

#### a. Fibromyalgia

Plaintiff submits the ALJ erred by failing to account for her fibromyalgia.  (Doc. No. 18 at 28-31.)   Plaintiff is correct that the decision does not include fibromyalgia among Plaintiff's severe impairments.  (Tr. 17.)  Nonetheless, that is not itself cause for remand, as "a *diagnosis* of fibromyalgia does not automatically entitle [claimant] to disability benefits."  *Torres v. Comm'r of Soc. Sec.*, 490 Fed. Appx. 748, 754 (6th Cir. 2012) (citing *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir. 2008) (emphasis in original) (citing *Sarchet v. Chater*, 78 F.3d 305 (7th Cir. 1996), for the proposition that "[s]ome people may have a severe case of fibromyalgia as to be totally disabled from working . . . but most do not and the question is whether [claimant] is one of the minority.")).  It is also well established that the "mere diagnosis" of a condition "says nothing" about its severity or its effect on a claimant's ability to perform work. *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988).

The Court has serious reservations as to whether Plaintiff has a valid diagnosis of fibromyalgia.[9]  On remand, however, the ALJ should at least acknowledge that such a

---

[8]  As a remand is necessary based on Plaintiff's first assignment of error, the Court, in the interest of judicial economy, will address Plaintiff's remaining arguments only briefly.

[9]  Pursuant to Social Security Ruling ("SSR") 12-2p, 2012 SSR LEXIS 1, "Titles II and XVI: Evaluation of Fibromyalgia," to establish fibromyalgia as a "medically determinable impairment," certain specific criteria must be satisfied.  It is questionable whether Dr. Patel's non-specific mention of multiple trigger points is sufficient.  But, the ALJ's failure to discuss the fibromyalgia diagnosis specifically prevents this Court from reviewing the ALJ's reasons for apparently discounting it.

diagnosis exists and explain what, if any, weight is given to such a diagnosis and whether any limitations are necessary to account for such a condition.

### b.  Dr. Smith's Assessment

Plaintiff argues that the ALJ did not properly account for her mental limitations, specifically the limitations set forth in the opinion of examining but non-treating source Dr. Smith.  It is well established that an ALJ is not required to discuss each and every piece of evidence in the record.  *See, e.g.,* *Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004).  However, where the opinion of a medical source contradicts his RFC finding, an ALJ must explain why he did not include its limitations in his determination of a claimant's RFC.  *See, e.g.,* *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 881 (N.D. Ohio 2011) (Lioi, J.) ("In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis.").  Social Security Ruling 96-8p provides, "[t]he RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."  SSR 96-8p, 1996 WL 374184, *7 (July 2, 1996).

First, Plaintiff does not accurately quote the ALJ's opinion, and suggests the ALJ found there was insufficient evidence of severe mental impairments *under* Dr. Smith's January 2012 assessment.  (Doc. No. 18 at 30.)  By doing so, Plaintiff incorrectly suggests that the ALJ discredited Dr. Smith's opinion in its entirety.  To the contrary, the decision reads that, "despite the claimant's allegations of disabling limitations since April 1, 2009, there was insufficient evidence to establish severe mental impairments ***until***

21

Dr. Smith's assessment on January 28, 2012.  (Tr. 27) (emphasis added).  Rather than categorically rejecting Dr. Smith's opinion, as implied by Plaintiff's inaccuracy, the decision essentially states that Dr. Smith's opinion marked the first point in time where the presence of severe mental impairments was established.

Nonetheless, it is less than clear from the decision whether the ALJ actually incorporated the limitations assessed by Dr. Smith into the RFC, or whether those limitations were rejected due to Plaintiff's improvement with mental health treatment. (Tr. 27.)  Although an ALJ is not required to provide "good reasons" for rejecting the opinion of a non-treating source, if the RFC assessment conflicts with an opinion from a medical source, the decision must provide an explanation.

### 3.  Credibility Assessment

In Plaintiff's last assignment of error, she challenges the ALJ's assessment of her credibility, alleging that it is not supported by substantial evidence.  Credibility determinations regarding a claimant's subjective complaints rest with the ALJ, are entitled to considerable deference, and should not be discarded lightly.  *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Villarreal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).  However, the ALJ's credibility determinations must be reasonable and based on evidence from the record. *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007); *Weaver v. Sec'y of Health & Human Servs.*, 722 F.2d 313, 312 (6th Cir. 1983).  The ALJ also must provide an adequate explanation for his credibility determination.  "It is not sufficient to make a conclusory statement 'that an individual's allegations have been considered' or that 'the allegations are (or are not) credible.'" S.S.R. 96-7p, 1996 WL 374186 at *4

22

(S.S.A.).  Rather, the determination "must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reason for that weight."  *Id.*

Plaintiff's credibility argument centers entirely on her alleged fibromyalgia and her ensuing pain.  (Doc. No. 18 at 31-32.)  As the issue of whether Plaintiff suffers from fibromyalgia will be addressed upon remand in a new decision, the ALJ's decision on that issue may very well impact the credibility of Plaintiff's allegations of disabling pain. Therefore, the Court deems this argument moot.

## VI.    CONCLUSION

For the foregoing reasons, the final decision of the Commissioner is REVERSED and REMANDED for proceedings consistent with this opinion.

**IT IS SO ORDERED**.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: March 8, 2016